*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0171p.06

FILED - GR
07 MAY 16 AM 9:56
RONALD C. WESTON, SR., CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT MICH.
BY mrs
FOR YOUR INFORMATION

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

JIMMY RAY VALENTINE (04-2116); KENNETH JEROME VALENTINE (05-1877),
*Petitioners-Appellants,*

*v.*

UNITED STATES OF AMERICA,
*Respondent-Appellee.*

Nos. 04-2116; 05-1877

1:99cr1
4:05cv4

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
Nos. 99-00001; 05-00004—Richard A. Enslen, District Judge.

Argued: October 26, 2006

Decided and Filed: May 14, 2007

Before: MARTIN and COOK, Circuit Judges; BUNNING, District Judge.*

---

## COUNSEL

**ARGUED:** Jennifer L. Swize, JONES DAY, Washington, D.C., Timothy M. Holloway, Taylor, Michigan, for Appellants. Phillip J. Green, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Jennifer L. Swize, Lawrence D. Rosenberg, JONES DAY, Washington, D.C., Timothy M. Holloway, Taylor, Michigan, for Appellants. Brian K. Delaney, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

COOK, J., delivered the opinion of the court, in which BUNNING, D. J., joined. MARTIN, J. (pp. 14-24), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

COOK, Circuit Judge. Jimmy Ray and Kenneth Valentine were convicted of conspiring to possess and distribute cocaine powder and crack cocaine. They now raise numerous challenges to their convictions pursuant to 28 U.S.C. § 2255. The Valentines, jointly and severally, make a

---

*The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

number of arguments based on *United States v. Booker*, 543 U.S. 220 (2005). Largely for reasons this court articulated in *Humphress v. United States*, 398 F.3d 855 (6th Cir. 2005), these claims fail. Petitioners also make a number of ineffective-assistance claims, all but one of which lack merit. On that ground, we reverse and hold that Jimmy Ray Valentine is entitled to an evidentiary hearing to determine whether his trial counsel thwarted his efforts to accept a plea bargain. We affirm the district court on all other grounds.

## I. Background

### A. Jimmy Ray Valentine

Jimmy Ray was convicted in February 2000 of conspiracy to possess with intent to distribute cocaine and cocaine base. His 292-month sentence resulted from the district court's finding him responsible for at least 1.5 kilograms of cocaine base. Jimmy Ray appealed his sentence, arguing, inter alia, that he should be resentenced in light of the Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). This court rejected that argument and affirmed his conviction, *United States v. Valentine*, 70 F. App'x 314 (6th Cir. 2003), which became final on October 20, 2003.

The following year, Jimmy Ray moved for relief under 28 U.S.C. § 2255, alleging ineffective assistance of counsel. While his motion was pending in the district court, Jimmy Ray moved for leave to amend his petition to include an argument based on the intervening decision in *Blakely v. Washington*, 542 U.S. 296 (2004). The district court denied him leave to amend, concluding that *Blakely* did not apply to defendants on collateral review. The district court also denied his ineffective-assistance claims. Jimmy Ray then filed a notice of appeal and applied for a certificate of appealability, which the district court denied. While his application was pending, the Supreme Court announced its decision in *Booker v. United States*, 543 U.S. 220 (2005), to which Jimmy Ray directed this court's attention pursuant to Fed. R. App. P. 28(j). This court then granted a certificate of appealability on both his ineffective-assistance arguments and his *Booker* claim.

### B. Kenneth J. Valentine

Kenneth was tried with his brother Jimmy Ray and six other defendants, and was convicted of conspiracy to possess with intent to distribute cocaine base. Kenneth was sentenced to 292 months, predicated on the district court's finding that at least 1.5 kilograms of cocaine base were involved in the offense. Kenneth appealed, asserting, inter alia, arguments based on *Apprendi* and ineffective assistance of counsel. This court rejected his appeal in 2003, *Valentine*, 70 F. App'x at 314, and his conviction became final on January 26, 2004. Following the Supreme Court's issuance of *Booker*, Kenneth filed a motion pursuant to 28 U.S.C. § 2255, which the district court denied. Kenneth then appealed, and this court granted a certificate of appealability, allowing Kenneth to raise his ineffective-assistance and *Booker* claims.

## II. *Apprendi/Blakely/Booker*

### A. Procedural Issues

Although Jimmy Ray and Kenneth both rely on *Booker* to challenge aspects of their sentences, their cases arrive in different procedural postures. The merits of Kenneth's *Booker* challenge are properly before us, but Jimmy Ray's case arrives in the procedural posture of a denied motion for leave to amend. This distinction is irrelevant, however, because the district court based its ruling on the legal conclusion that Jimmy Ray's proposed amendment to include a *Blakely* argument would be futile as *Blakely* was inapplicable on collateral review, a conclusion we review

de novo. *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000). The issue in both cases is essentially the same: Kenneth is entitled to relief if *Booker* is applicable to his case on collateral review, and Jimmy Ray is entitled to amend his petition to include a *Booker* argument if *Booker* applies on collateral review. Were *Booker* applicable to their cases, both Valentines state cognizable *Booker* claims entitling them to resentencing.

**B. *Booker* Is a New Rule of Criminal Procedure: Jimmy Ray and Kenneth**

Jimmy Ray and Kenneth both contend that the district court erred and that *Booker* applies to their cases on collateral review because *Booker* did not announce a "new rule" of criminal procedure. *Blakely* and *Booker* were mere applications of *Apprendi*, they argue, and not "new rules" for purposes of collateral review of their convictions, which became final after *Apprendi*.

In most instances, defendants seeking collateral relief may not rely on new rules of criminal procedure announced after their convictions have become final on direct appeal. *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004). In *Teague v. Lane*, 489 U.S. 288 (1989), the Supreme Court announced a three-step analysis for determining when a new procedural rule will apply retroactively to cases on collateral review. As the Supreme Court explained in *Beard v. Banks*, 542 U.S. 406, 411 (2004) (internal citations omitted):

> First, the court must determine when the defendant's conviction became final. Second, it must ascertain the "legal landscape as it then existed," and ask whether the Constitution, as interpreted by the precedent then existing, compels the rule. That is, the court must decide whether the rule is actually "new." Finally, if the rule is new, the court must consider whether it falls within either of the two exceptions to nonretroactivity.

The *Beard* Court further explained that the second step of the *Teague* analysis asks "whether the [relevant] rule . . . was *dictated* by then-existing precedent—whether, that is, the unlawfulness of [petitioners'] conviction[s] was apparent to all reasonable jurists." *Id.* at 413 (internal citations omitted). Jimmy Ray's and Kenneth's convictions became final after *Apprendi* and prior to *Blakely*. Our *Humphress* decision addressed *Booker*'s retroactivity, however, and held that *Booker* does not apply retroactively to cases on collateral review. 398 F.3d 860–63. The Valentines attempt to distinguish their case, however, on the ground that Humphress's conviction became final prior to *Apprendi* whereas their convictions became final after *Apprendi*, but before *Blakely* and *Booker*.[1]

But this argument ignores several key facts about the *Humphress* decision. First, the *Humphress* court actually decided that *Booker* was not dictated by *Blakely*, and therefore *Booker* created a "new rule" that could not be raised by defendants whose convictions became final at any time prior to *Booker*'s January 12, 2005, issuance. 398 F.3d at 860–62. If *Booker* was a new rule despite *Blakely*, it follows that it was a new rule despite *Apprendi*. Put simply, the timing of *Apprendi* had no bearing on this court's decision in *Humphress*.

Second, the *Humphress* court pointed out that dissents in *Booker* made clear that *Booker*'s result was not preordained by *Blakely*. *See id.* at 861 (citing *Booker*, 543 U.S. at 334 (Breyer, J.,

---

[1] In support of this distinction, the Valentines point to the *Humphress* court's framing of the issue before it: "We must therefore assay the legal landscape as of [January 2000] and ask 'whether the rule later announced in [*Booker*] was *dictated* by then-existing precedent—whether, that is, the unlawfulness of [respondent's] conviction was apparent to all reasonable jurists.'" *Humphress*, 398 F.3d at 860 (quoting *Beard*, 542 U.S. at 413).

dissenting) (opining that factual distinctions "offer a principled basis" for refusing to extend *Blakely* and *Apprendi* to the Federal Sentencing Guidelines)). The views expressed in dissent, as the *Humphress* court explained, were indicative of the *Booker* rule's "newness":

> Although Justice O'Connor observed that "Washington's scheme is almost identical to the upward departure regime established by 18 U.S.C. § 3553(b) and implemented in USSG § 5K2.0," *Blakely*, 124 S.Ct. at 2549 (O'Connor, J., dissenting), it was by no means a foregone conclusion that the rule in *Blakely* rendered the Federal Guidelines unconstitutional, as Justice Breyer's dissent in *Booker* proves. *Booker*, 125 S.Ct. at 802–03 (Breyer, J., dissenting).

*Id.* at 861 n.2.

Third, the *Humphress* court also noted that "the differing interpretations of *Blakely* announced by the United States Courts of Appeals also indicate that not all reasonable jurists believed that the *Booker* rule was compelled by *Blakely*." *Id.* at 861. The *Humphress* court pointed out that this circuit, in *United States v. Koch*, 383 F.3d 436 (6th Cir. 2004) (en banc), joined the "Second, Fourth and Fifth Circuits in holding that *Blakely* did not compel the conclusion that the Federal Sentencing Guidelines violate the Sixth Amendment." 398 F.3d at 861 (citing *United States v. Mincey*, 380 F.3d 102 (2d Cir. 2004), *United States v. Hammoud*, 378 F.3d 426 (4th Cir. 2004) (en banc), and *United States v. Pineiro*, 377 F.3d 464 (5th Cir. 2004)). The court went on to explain:

> Even those Circuits that have applied *Blakely*'s rule to the Federal Guidelines have done so over dissents. . . . We are mindful of the observation in *Beard* that "[b]ecause the focus of the inquiry is whether *reasonable* jurists could differ as to whether precedent compels the sought-for rule, we do not suggest that the mere existence of a dissent suffices to show that the rule is new." *Beard*, 124 S.Ct. at 2513 n.5. We are confident, however, not only that the jurists who authored those majority opinions and dissents are reasonable, but that these opinions and dissents make it manifest that the rule of *Booker* is new.

*Humphress*, 398 F.3d at 861–62 (citations omitted).

To the extent that *Humphress* does not strictly control this issue because of the timing of Humphress's conviction vis-à-vis *Apprendi*, its reasoning remains persuasive.[2] Moreover, other courts of appeals have considered and rejected the same arguments in cases involving similarly situated petitioners whose convictions became final after *Apprendi*. *See, e.g., Never Misses A Shot v. United States*, 413 F.3d 781, 782–83 (8th Cir. 2005) (petitioner whose conviction became final after *Apprendi* but before *Booker* could not raise *Booker* claims because "the 'new rule' announced in *Booker* does not apply to criminal convictions that became final before the rule was announced, and thus does not benefit movants in collateral proceedings"); *Lloyd v. United States*, 407 F.3d 608, 612–14 (3d Cir. 2005) (same); *Guzman v. United States*, 404 F.3d 139, 142 (2d Cir. 2005) (same); *United States v. Price,* 400 F.3d 844, 848–49 (10th Cir. 2005) (holding that while *Blakely* interpreted *Apprendi*, it was not compelled by *Apprendi*, and thus petitioner whose conviction became final post-*Apprendi* but pre-*Blakely* could not raise *Blakely* claims on collateral review); *McReynolds v. United States*, 397 F.3d 479, 481 (7th Cir. 2005) ("*Booker* does not apply retroactively to criminal cases that became final before its release. . . . *Blakely* reserved decision about the status of the

[2] Indeed, although *Lang v. United States*, 474 F.3d 348, 353 (6th Cir. 2007), did not have occasion to address the issue as argued by the Valentines here, it could be read to foreclose this claim.

federal Sentencing Guidelines . . . so *Booker* itself represents the establishment of a new rule about the federal system.").

We find the views expressed by this court in *Humphress* and those presented by our sister circuits persuasive. We therefore cannot conclude that "the rule later announced in [*Booker*] was *dictated* by then-existing precedent [such that] the unlawfulness of [petitioners'] conviction was *apparent to all reasonable jurists*." *Beard*, 542 U.S. at 413 (second emphasis added). We hold that petitioners whose convictions became final prior to *Booker* may not rely on *Booker*'s rule on collateral review.

**C. *Booker* Is Procedural, Not Substantive: Kenneth Only**

Kenneth also contends that *Apprendi* and its progeny have "redefined the substantive law regarding federal narcotics prosecutions." Kenneth presumably makes this argument because the *Teague* rule of nonretroactivity does not apply to new substantive rules. *See Teague*, 489 U.S. at 311. As we noted in *Humphress*, however, "Without question, this rule is a procedural one," 398 F.3d at 860 n.1 (citing *Schriro*, 542 U.S. at 348), and Kenneth's argument fails.

**D. *Booker* Is Not a "Watershed Rule of Criminal Procedure": Kenneth Only**

*Teague* nonretroactivity contains a second exception for new rules of criminal procedure that are "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Beard*, 542 U.S. at 417. This rule, as the Court in *Beard* pointed out, has "limited scope" and "is clearly meant to apply only to a small core of rules requiring observance of those procedures that . . . are implicit in the concept of ordered liberty." *Id.* Moreover, the *Beard* Court explained that "because any qualifying rule would be so central to an accurate determination of innocence or guilt [that it is] unlikely that many such components of basic due process have yet to emerge, it should come as no surprise that we have yet to find a new rule that falls under the second *Teague* exception." *Id.*

Kenneth nevertheless argues that the "reasonable doubt rulings in the *Apprendi* line of cases establish a watershed rule that must be applied retroactively under *Teague* due to its impact on the truth-finding function of a trial." But the Supreme Court's reasonable doubt rulings form the core of *Apprendi*; they are not a separate strand of principles which have not been analyzed for purposes of this issue. Moreover, this court addressed this issue in *Humphress*, holding that *Booker* did not create a watershed rule of criminal procedure. 398 F.3d at 863. This argument fails as well.

**E. Application of Equity to *Booker* Issues: Kenneth Only**

In his final *Booker* argument, Kenneth asks the court to create an equitable rule to allow defendants who raised an *Apprendi* argument on direct review to raise a *Booker* argument on collateral review. *Teague* forecloses such relief.

## III. Ineffective Assistance of Counsel

**A. Standard of Review**

In reviewing a district court's ruling on a § 2255 petition, this court reviews findings of fact for clear error and conclusions of law de novo. *Paulino v. United States*, 352 F.3d 1056, 1058 (6th Cir. 2003).

**B. The Intersection of 28 U.S.C. § 2255 and *Strickland v. Washington***

A prisoner who proves that the process leading to his conviction was tainted by an "error of constitutional magnitude" is entitled to relief under § 2255. *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). The Valentines claim they were denied the effective assistance of counsel guaranteed by the Sixth Amendment. *See McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). Their challenges here are therefore governed by the well-known "performance" and "prejudice" standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish constitutionally ineffective assistance of counsel, a petitioner must show that (1) his "counsel's representation fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

**C. Trial Counsel's Alleged Failure to Communicate Jimmy Ray's Desire to Accept a Plea**

**1. Factual Background**

Jimmy Ray claims that he learned in February or March 1999 that the government had offered him a ten-year plea arrangement, but his trial counsel advised him there was "no rush" to accept because he believed the government would make a better offer later in the proceedings. According to Jimmy Ray, however, the government made no additional offers, and he repeatedly told his trial counsel that he would like to accept the government's ten-year offer. Trial counsel ignored Jimmy Ray's wishes, he alleges, and took the case to trial in January 2000, where Jimmy Ray was convicted and sentenced to 292 months.

The government disputes Jimmy Ray's factual allegations, contending (1) that it never offered Jimmy Ray a ten-year plea agreement, and (2) that Jimmy Ray made his own decisions about his trial. The government points to a colloquy at Jimmy Ray's sentencing hearing in which defense counsel made the following representations to the district court:

> And he would have taken a deal, Your Honor, he would have taken a deal in a second had the Government chose to give him a crime that he felt he was guilty of instead of something he wasn't. He adamantly maintained from day one, "I did not do this. I am no leader. I did not move millions of dollars worth of crack cocaine. I don't have millions of dollars. I don't even have thousands of dollars. I didn't do this." That's what he told me time and time again.
>
> He is not a stupid man, but he is not a brilliant man, but he understands what I told him, "You go to trial and lose, it is life." I told him that. He will tell you that. He said, "I don't care, I didn't do what they say I did."

According to the government, this statement "establishes that the government never offered a ten-year plea agreement" to Jimmy Ray and that Jimmy Ray "was not kept in the dark on anything and freely made his own decision to go to trial." The government observes that Jimmy Ray maintained his innocence during his sentencing hearing, apparently implying that he would not have accepted any plea, had one been offered. Moreover, the government points out that Jimmy Ray had ten months in which to complain about his lawyer's alleged dereliction, but he made no complaints during pretrial proceedings, at trial, or at his sentencing hearing.

Jimmy Ray disputes the government's characterization of his counsel's statements at the sentencing hearing and contends that they illustrate his trial counsel's dishonesty. Jimmy Ray argues

that his attorney's statement "that his client would have taken a deal 'had the Government chose[n] to give him a crime that he felt he was guilty of instead of something that he wasn't'" can be interpreted as an attempt by his attorney to "conceal his failure to communicate Mr. Valentine's acceptance of the ten-year plea offer." Jimmy Ray also accuses the government of dissembling in its interpretation of his attorney's statement and his own statement at the sentencing hearing, which he maintains should be interpreted in the context of "disputing the Government's leadership charge," rather than as general claims of innocence.

**2. Analysis**

Jimmy Ray highlighted his claim in his § 2255 motion, but the district court denied him an evidentiary hearing on the matter. We need only determine whether Jimmy Ray is entitled to an evidentiary hearing to resolve whether the government offered him a plea that his lawyer essentially prevented him from accepting. If Jimmy Ray's trial counsel prevented him from accepting a plea, his assistance was clearly ineffective and, because the alleged plea agreement offered Jimmy Ray substantially less prison time (120 months rather than his 292-month sentence), he could show sufficient prejudice to satisfy *Strickland*'s second prong. The district court denied Jimmy Ray's claim, finding that the "[d]efendant has not presented specific, credible evidence supporting his claim [on this ground."] This court reviews that determination for abuse of discretion. *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999).

In reviewing a § 2255 motion in which a factual dispute arises, "the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999). "[T]he burden on the petitioner in a *habeas* case for establishing an entitlement to an evidentiary hearing is relatively light." *Id.* More is required, however, than mere assertions of innocence. *See id.* ("[I]t would be nonsensical to conclude that the petitioner could meet that burden simply by proclaiming his innocence."). Nevertheless, "[a]n evidentiary hearing is required unless the record conclusively shows that the petitioner is entitled to no relief." *Arredondo*, 178 F.3d at 782 (internal quotations omitted). Stated another way, "no hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Id.* (internal quotations omitted).

We conclude, for several reasons, that Jimmy Ray met his burden, and the district court erred in declining to hold a hearing. First, although the government implies that Jimmy Ray's protestations of innocence discredit his argument that he was willing to accept a plea, this circuit has rejected this reasoning in the past. *See Griffin v. United States*, 330 F.3d 733, 738 (6th Cir. 2003) (citing *North Carolina v. Alford*, 400 U.S. 25, 33 (1970)) ("Griffin's repeated declarations of innocence do not prove, as the government claims, that he would not have accepted a guilty plea."). This court has also explained that "[p]rotestations of innocence throughout trial are properly a factor in the trial court's analysis, however they do not, by themselves, justify summary denial of relief without an evidentiary hearing." *Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003).

Second, the authority relied on by the district court, *Moss v. United States*, 323 F.3d 445 (6th Cir. 2003), does not support its conclusion that a defendant's affidavit alone could not present sufficient evidence supporting his request for a hearing. The *Moss* district court reached its conclusion only after an extensive three-day hearing on the evidence surrounding the defendant's ineffective-assistance and other claims. *Id.* at 453.

Third, the conclusions the government draws from Jimmy Ray's counsel's statement at his sentencing hearing are unsupported by the record. From the statement, "he would have taken a deal

. . . had the Government chosen to give him a crime that he felt he was guilty of," the government draws the conclusion that "the Government never offered a ten-year plea agreement to the Defendant." But the government's reasoning is flawed. Taking the statement at face value, it proves only that Jimmy Ray was never offered a plea to a "crime that he felt he was guilty of," not that he was never offered a plea at all. The government's assertion may be correct, but it does not follow from the colloquy it quotes. Furthermore, it is strange that the government claims it never offered Jimmy Ray a plea, but then relies on an ambiguous statement by Jimmy Ray's counsel to prove this claim in its brief, rather than an affidavit from Jimmy Ray's trial counsel or its own trial attorneys who litigated the matter.

The defendant's burden to show his right to a hearing is significantly lower than his burden to show he is entitled to § 2255 relief. *See Turner*, 183 F.3d at 477. Here, Jimmy Ray offers more than a mere assertion of his innocence; he presents a factual narrative of the events that is neither contradicted by the record nor "inherently incredible." His claim may prove false at the evidentiary hearing, but it is impossible to assess its veracity based on this record alone. The purpose of the hearing, however, is to allow the court to make these factual determinations based on more than a defendant's affidavit and the contrary representations of the government. Therefore, we reverse the district court's judgment on this issue and remand for an evidentiary hearing on this claim.

**D. Jury Communication/Denial of Counsel: Jimmy Ray Only**

**1. Factual Background**

Jimmy Ray alleges he was denied counsel during a critical stage of his trial. The relevant facts are as follows. The jury began deliberating at approximately 9:00 a.m. on Thursday, February 10, 2000. The next morning, when the jury reconvened to continue its deliberations, the court sent it the following message:

> Dear jury, there is no time limit nor is there any hurry in your deliberations. However, I must catch a plane today at 1:30. Therefore, if you do not have a verdict by 12:00, I will discharge you until Tuesday morning at 8:30, February the 15th, 2000.

The court did not contact the defendants' attorneys prior to delivering its message. During the morning, however, the court gave defense counsel an opportunity to submit a substitute note, which he declined. Court was reconvened later that morning after the jury delivered a note to the court indicating that it had reached a verdict on all but one defendant, and had deliberated about that defendant for six hours. Defense attorney Mitchell objected to the note, arguing that "it had the potential of creating a verdict before the verdict's time." The court overruled the objection. The district court asked if the note made the jury feel rushed in reaching its verdicts, and the jury also answered "No." The jury then delivered its verdicts with respect to all defendants but one, and reconvened the following Tuesday to continue deliberations.

**2. Analysis**

In his brief, Jimmy Ray frames this scenario as a Sixth Amendment "denial of counsel" claim, rather than an instance of ineffective assistance by his trial counsel (his § 2255 petition argued both theories). Because the court gave its message to the jury after trying and failing to gather the defendants' lawyers, it is difficult for counsel to be considered ineffective. Thus, if Jimmy Ray is entitled to relief under this claim, it would be because he was denied counsel, not because counsel was ineffective.

Jimmy Ray invokes the principle that "denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice." *Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000); *see also United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984). Stated another way, denial of counsel is considered a "structural error," which entitles a defendant to a new trial without showing prejudice under *Strickland*'s second prong—prejudice is presumed because the error makes "the adversary process itself presumptively unreliable." *Cronic*, 466 U.S. at 659. Jimmy Ray must show that the district court's communication with the jury constituted a "critical stage" of the trial, recently defined by the Supreme Court as "a step of a criminal proceeding, such as an arraignment, that [holds] significant consequences for the accused." *Bell v. Cone*, 535 U.S. 685, 695–96 (2002). Because this court has held that certain instances of jury "re-instruction" and the reading of supplemental instructions to the jury qualify as "critical stages," *see, e.g.*, *Caver v. Straub*, 349 F.3d 340, 350 (6th Cir. 2003); *French v. Jones*, 332 F.3d 430, 436 (6th Cir. 2003), Jimmy Ray labels the district court's note an "instruction" given outside the presence of counsel. We reject this characterization. Cases in which this court has found denial of counsel at a critical stage invariably involve a court instructing the jury about the substantive elements of an offense or giving a deadlocked jury further instructions about how to proceed. *See, e.g.*, *Caver*, 349 F.3d at 349 n.6 (counsel was absent when the jury was re-instructed "on certain elements of the offense after they had deliberated"); *French*, 332 F.3d at 430 (judge gave an improvised deadlocked jury instruction, later complained of as coercive, after hearing that the jury had reached a third impasse).

In this case, however, the note conveyed only scheduling information, with the caveat that jury need not hurry its deliberations—arguably not an "instruction" at all. The Tenth Circuit addressed a factually similar situation in *United States v. McMurry*, 818 F.2d 24 (10th Cir. 1987), where the defendant challenged a statement the trial judge made to the jury in the absence of his counsel as an improper *Allen* charge. After several hours of deliberations, the trial judge told the jury "that he had to catch a plane in several hours and that if it had not finished deliberating by then he would call a recess over the weekend and allow deliberations to continue the following week." *Id.* at 26–27. Although the procedural posture and claims at issue in *McMurry* differ from this case, the Tenth Circuit's conclusion is informative:

> The statement was simply not an instruction at all. . . . The statement was made after the jury had deliberated about four hours on a Thursday and three hours on Friday. The judge had called the jury into the courtroom to discuss lunch arrangements. We must view this as no more than an explanation about the schedule for lunch and for subsequent deliberations. With the weekend having arrived it was necessary to give the jury a schedule for the balance of the day and the next week. The jury was entitled to such an explanation for its plans. It had nothing whatever to do with the length of deliberations but was, again, a needed schedule. The explanation can in no way be considered as an instruction.

*Id.* We view the district court's message in the same way, as not fitting within the category of jury instruction or re-instruction that demands the presence of counsel.

And though a coercive instruction could be characterized as a "critical stage," which holds "significant consequences for the accused," *Cone*, 535 U.S. at 695–96, we have held similar statements not coercive. *See United States v. Markey*, 693 F.2d 594, 597 (6th Cir. 1982); *see also Gibson v. United States*, 271 F.3d 247, 258 (6th Cir. 2001), *overruled on other grounds by United States v. Leachman*, 309 F.3d 377 (6th Cir. 2002); *United States v. Ratliff*, 63 F. App'x 192 (6th Cir. 2003) (unpublished opinion).

"In evaluating for coercive effect a judge's statement to the jury, this Court must consider the statement in context, assessing it under the totality of the circumstances." *Gibson*, 271 F.3d at 258. In *Markey*, the defendant contended that the district judge "'coerced' the jury into reaching a speedy verdict [because the judge commented,] at the conclusion of trial, that the courthouse would be available the following morning (Christmas Eve) if the jury was unable to reach a consensus that afternoon." 693 F.2d at 594. The *Markey* defendant's coercion charge mirrors Jimmy Ray's: The court's message in both cases informed the jury that if it did not reach a verdict by a certain time, it would have to return to deliberate at a supposedly undesirable time, a holiday in *Markey* and several days later in Jimmy Ray's case. The court in *Markey* found that "the trial judge's charge was *not* 'likely to give the jury the impression that it was more important to be quick than to be thoughtful.'" *Id.* (quoting *United States v. Green*, 523 F.2d 229 (2d Cir. 1975)). Viewing this situation with the lens *Markey* provides, we are confident the message did not coerce the jury into reaching its verdict, its quickness notwithstanding. This court has repeatedly held that "the jury's speed in reaching a verdict is irrelevant to whether an instruction was coercive." *Ratliff*, 63 F. App'x at 195–96 (citing *United States v. Giacalone*, 588 F.2d 1158, 1168 (6th Cir. 1978)); *United States v. Tines*, 70 F.3d 891, 896 (6th Cir. 1995). Therefore, we deny his petition for relief on these grounds.

## E. Ineffective Assistance of Appellate Counsel/*Batson*: Jimmy Ray and Kenneth

### 1. Factual Background

Jimmy Ray and Kenneth claim their appellate counsel was ineffective for failing to appeal the district court's decision to allow the government's peremptory challenge to a prospective juror, Carl Pratt. During jury selection, defense counsel objected under *Batson*, explaining that only two members of the panel were "people of color" and that one was already excused for cause. Defense counsel stated: "There is one other person and that's Mr. Pratt. I'd say that he is a black man. I don't know for sure, but he certainly looks like a black man to me. And he has been summarily excused by the prosecution."

The district court then requested a response from Assistant United States Attorney Brian Delaney. Delaney responded with surprise, apparently because he and none of the people sitting with him thought that Pratt "was a black man." The court then stated, "Your non-discriminatory reason for challenging him is because you did not know that he was an ethic [sic] minority; is that a fair statement?" Delaney responded, "That's true, but we had reasons why we dismissed him that had nothing to do with race." Delaney provided four reasons:

> [1] He is only 46 years old and he shows that he is retired. That kind of concerns me, someone who isn't working and involved in the community. [2] Another concern was that instead of getting workmen's comp if it was a back injury he had, he didn't even get any, it makes me wonder about the suspicious circumstances that might have surrounded his leaving work. Usually people who are legitimately injured get compensation for that loss, rightfully, and he did not, which makes me subject to think that perhaps there was something missing there. He said he had resigned from his employment. Just suspicious circumstances. I mean, it's not illegal to do it, but it makes me wonder about the person. [3] He failed to place in the upper-hand left corner or right corner the city from which he lived. [4] I did notice, it's just my own feelings, that he had an earring that we could notice in his left ear. I tend to kick some people off, males that have earrings, just because sometimes a lot of law enforcement officers wear them, but just as an idea of whether someone is conservative or not. That's somewhat unusual. That's the only male on the panel that's wearing an earring. And whether that is a good reason or not, it was one of the reasons.

The district court responded, correctly, that "it doesn't have to be a good reason, it has to be a non-discriminatory reason." He then gave defense counsel an opportunity to respond. Defense counsel responded to Delaney's worker's compensation reason by pointing out that

> Mr. Pratt told this court why he did not bother to get worker's comp. He said his wife had died last year and that he was getting over that and working through all that. There is nothing unusual about that. If Mr. Delaney is telling you that's his reason, I think it's not a good reason. I realize it's probably a non-discriminatory reason, but it's not a very good reason.

Defense counsel also discussed the earring: "[t]he fact he has an earring, I can't believe that's a reason the government goes around getting rid of people." Defense counsel continued, explaining that he is "looking for black people on my juries, especially when I look around and see eight black defendants sitting behind eight white lawyers. There ought to be black people on juries and I don't believe that this is a valid reason for peremptory challenging this juror. I think they have expressed discriminatory reasons for getting rid of this." The court then asked, "What was the discriminatory reason they expressed?" Defense counsel responded, "The earring seems," to which the court replied, "White people wear earrings." Defense counsel then attempted again to articulate a rationale for his feeling that prosecutors challenged Pratt for a discriminatory reason:

> I can't express it, other than to say that what they've expressed is inadequate. It doesn't explain to me why they got rid of Mr. Pratt. There is no reason that I can see, other than the fact I think he is black and that's why they got rid of him. That's my belief.

The court concluded as follows:

> As far as Mr. Pratt is concerned, the Court's observations are that his race was unclear. He didn't put anything on his card, nor did he say that he was or was not a member of some race. Like Mr. Mitchell, I believe him to be a black man. But that's how I look at things. I have to accept the word of Mr. Lennon and Mr. Delaney and Mr. DiBrito when they tell me they did not think so. And for that reason the motion is denied.

The district court then offered defense counsel the opportunity to "cross-examine or examine people from the clerk's office who selected this jury" to give defense counsel the chance to investigate why there were only two black people on the panel. Defense counsel declined this opportunity. Before bringing the jury back into the courtroom, the court stated, "Mr. Delaney, I'll give you a chance to reconsider on Pratt. I think he was black. I'm not going to honor the objection. But if you, now having been told he is black, want to invite him back on the jury, you may." Delaney responded, "I don't agree with the assertion that he is black. I mean, I don't understand that, Your Honor, by saying now that he is black. I mean, I can only say." The court then said,

> I'll let you in on a little tip. When I asked the question about are any of you black, he nodded affirmatively. He's the only person who did. I said, I don't think any of you are African-American, but I don't know. He clearly indicated he was an African-American. Clearly. But you had to be looking to see it. If you weren't looking, you didn't see it.

Delaney responded, "I can only say for the record I didn't see it, it never even crossed my mind, Your Honor." The court said, " Again, I'm inviting you to invite him back, but I'm not requiring you to."

Delaney responded, "I would still, I mean, peremptory challenge I have non-discriminatory purpose for doing it and I'm going to stand by that." The court replied, "And I upheld it. Bring the jury back without Mr. Pratt. Tell him he is excused."

**2. Analysis**

Defendants raising claims of ineffective assistance by appellate counsel must meet *Strickland*'s two-prong test. *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004). In the appellate context, the court must first assess the strength of the claim appellate counsel failed to raise. "Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Id.* As the court in *McFarland* explained, "[i]f there is a reasonable probability that [the defendant] would have prevailed on appeal had the claim been raised, we can then consider whether the claim's merit was so compelling that appellate counsel's failure to raise it amounted to ineffective assistance of appellate counsel." *Id.* at 700. In order to assess the effectiveness of Jimmy Ray's and Kenneth's appellate counsel, then, the court must first consider whether a *Batson* claim on appeal had a reasonable probability of success. Applying this court's precedent to the facts in the record, a *Batson* claim had little probability of success.

The Equal Protection Clause prohibits a prosecutor's use of peremptory challenges in a racially discriminatory manner. *Batson v. Kentucky*, 476 U.S. 79 (1986). In assessing *Batson* claims, we employ a three-step analysis: "Under *Batson*, a defendant must first establish a prima facie case showing that the prosecution exercised peremptory strikes on the basis of race. If the defendant satisfies this requirement, the prosecution must articulate a race-neutral explanation for the challenges. The trial court must then decide if the defendant has carried the burden of proving purposeful discrimination." *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996) (citing *Batson*, 476 U.S. at 96–98).

In assessing the prosecutor's articulated reasons, the Supreme Court has provided, and the district correctly recognized, that "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible. . . . [T]he issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995). Our review of the district court's resolution of the ultimate issue—whether the defendant has established purposeful discrimination—is limited: "[b]ecause this determination turns largely on the evaluation of credibility, reviewing courts give the findings of the district court great deference." *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999) (citing *Batson*, 476 U.S. at 98 n.21). "We may reverse that finding of fact only where we find *clear error*." *United States v. Hill*, 146 F.3d 337, 341 (6th Cir. 1998) (citing *Hernandez v. New York*, 500 U.S. 352, 369 (1991)) (emphasis added). As the Supreme Court counseled in *Purkett*, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." 514 U.S. at 768.

Although the district court in this case could have provided a more precise analysis of the issue, the record reveals no clear error in the court's finding that there was no discrimination. The prosecutor articulated several reasons, none of which contained discriminatory undertones or implications. The district court considered the government's reasons and provided defense counsel the opportunity to meet his burden by showing a discriminatory implication in Delaney's statements, but defense counsel did not meet his burden and instead merely said that he had a "belief" that the government's reasons were discriminatory. This "belief" does not meet defense counsel's "ultimate burden of persuasion regarding racial motivation[, which] rests with, and never shifts from, the opponent of the strike." *Id.* The district court ultimately denied the objection, stating that Pratt's race

was unclear and he "had to accept the word" of the prosecutors that they were unaware of Pratt's race and thus did not strike him for that reason. In other words, the district judge found Delaney's explanation credible, and this kind of determination is given "great deference." *Harris*, 192 F.3d at 586 (citing *Batson*, 476 U.S. at 98 n.21). Therefore, the district court's *Batson* ruling was not clear error.[3] Given this conclusion, Jimmy Ray's and Kenneth's ineffective-assistance-of-appellate-counsel claims must also fail, as they cannot show that their appellate counsel failed to include an issue that had a reasonable probability of changing the result of the appeal. *See McFarland*, 356 F.3d at 699.

## IV. Conclusion

We affirm the district court's denial of Jimmy Ray's and Kenneth's challenges based on *Booker*, and their ineffective-assistance claims, but we reverse the district court's decision denying Jimmy Ray an evidentiary hearing on whether his trial counsel denied him the opportunity to accept a plea bargain and remand to the district court for a hearing on this issue.

---

[3] The record is unclear why the district court then asked Delaney if he would like to voluntarily invite Pratt back on the jury, given that the court ultimately decided that Pratt was black. The record is clear, however, that the district court maintained its initial ruling on the issue, and we review that ruling.

## CONCURRING IN PART, DISSENTING IN PART

BOYCE F. MARTIN, JR., Circuit Judge, concurring in part and dissenting in part. I join the result reached by the majority, except for its conclusion in Part II.B. regarding the retroactive application of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005). The majority's analysis presents this issue fairly, and finds support in our precedent. Even so, I dissent to underscore what I believe to be an important theoretical difference that I have regarding *Booker*'s retroactive application.

I have previously written, and continue to believe, that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), commanded the Supreme Court's subsequent decisions in *Blakely v. Washington*, 542 U.S. 296 (2004), and *Booker*. *See United States v. Koch*, 383 F.3d 436, 443 (6th Cir. 2004) (en banc) (Martin, J., dissenting) ("The seeds of *Blakely* were sown in *Apprendi*[], in which the Supreme Court held that 'other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'"). The Supreme Court confirmed this belief in *Booker* itself when it stated, succinctly and unequivocally, that "we reaffirm our holding in *Apprendi*: Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 543 U.S. at 244. As I am inclined to think the Court meant what it said, I believe that neither *Blakely* nor *Booker* created a new rule, but merely applied the rule already laid down in *Apprendi*. The rule from *Booker* should therefore apply retroactively to habeas petitioners, like the Valentines, whose convictions became final **after** the Court issued its decision in *Apprendi*.

I.

At the outset, I do not believe that this Court's decision in *United States v. Humphress*, 398 F.3d 855 (6th Cir. 2005), controls the result here. The conviction of the defendant in *Humphress* became final **before** the Supreme Court's decision in *Apprendi*, as the majority acknowledges. As a result, the question faced by the panel in *Humphress* was not, as it is here, whether *Apprendi* dictated the result in *Booker*, but rather whether the rule from *Booker* was dictated by precedent that predated *Apprendi*. I agree with the end result reached in *Humphress* because I believe that *Apprendi* itself announced a new rule, and that petitioners whose convictions predated this decision would be barred from obtaining relief under *Apprendi*, *Blakely*, or *Booker*. To the extent that the *Humphress* panel discussed whether *Blakely* or *Apprendi* dictated the result in *Booker*, however, this analysis is dicta, as it was unnecessary to reach the conclusion that no precedent at the time the petitioner's conviction became final (before *Apprendi*) dictated the result in *Booker*.[1] *See Central Virg. Cmty. College v. Katz*, 546 U.S. 356 (2006) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated.") (citing *Cohens v. Virginia*, 19 U.S. 264 (1821) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in

[1] This is not to suggest that the *Humphress* opinion somehow overreached or was off-base for the analytical approach that it followed. If, as the panel clearly believed, *Blakely* and *Apprendi* did not dictate *Booker*, then it naturally follows that no pre-*Apprendi* precedent dictated *Booker* either. This may have been a simple way of reaching its conclusion regarding *Booker*'s retroactive application to a pre-*Apprendi* conviction. Nevertheless, this portion of its reasoning went beyond the precise question presented to the panel, and does not bind us to follow it.

connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.")). The panel's view in *Humphress* may well be informative with respect to the question of whether reasonable jurists believed *Booker* was compelled by *Blakely* for purposes of examining *Booker*'s retroactive application under *Teague v. Lane*, 489 U.S. 288 (1989). It does not, however, act as a binding precedent from this Court on the issue we face here.[2]

Under *Teague*, "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." 489 U.S. 310. Thus, if the rule from *Booker* was new, and not dictated by *Apprendi*, there is little doubt that the petitioners here could not benefit from it, as it was not part of the legal landscape at the time of their convictions (leaving to the side for now any discussion of the *Teague* exceptions). *See Beard v. Banks*, 542 U.S. 406, 4133 (2004). The majority effectively catalogues a number of judicial opinions that like *Humphress*, concluded that *Apprendi* did not dictate *Booker*, either in holdings or in dicta. These opinions are relevant to show that not all reasonable jurists believed in the inevitability of *Booker*, which, under *Teague*'s progeny, indicates that *Booker* created a new rule after the petitioners' convictions became final and from which they cannot now benefit. *See Beard*, 542 U.S. at 413. Under this conventional approach, even if all the members of our panel were inclined to believe that *Booker* was dictated by *Apprendi*, the fact that many of our colleagues previously believed otherwise would render the rule from *Booker* new, despite our current beliefs to the contrary. This leads me to ponder a question that I am not sure has been answered by the Supreme Court or this Court: Does the "apparent to all reasonable jurists" inquiry, which is relevant under *Teague* and its progeny to determining a rule's "newness," apply with the same force to a strictly federal rule of criminal procedure, raised in a habeas challenge to a federal conviction under 28 U.S.C. § 2255, as it does in habeas proceedings addressing state convictions under 28 U.S.C. § 2254?[3]

*Teague* itself arose in the context of a habeas review of a state court conviction, and did not address the appropriate retroactivity analysis in habeas reviews of federal conviction. 489 U.S. 288, 328 (Brennan, J., dissenting) ("The plurality does not address the question whether the rule it announces today extends to claims brought by federal, as well as state, prisoners."). The *Teague*

---

[2] Nor is it clear to me why the majority suggests that *Lang v. United States*, 474 F.3d 348, 353 (6th Cir. 2007), "could be read to foreclose" the "issue as argued by the Valentines here." Maj. Op. at 4. As the majority acknowledges, *Lang* in no way addressed whether *Booker* was dictated by *Apprendi*, apparently because the petitioner in *Lang* did not raise this argument. The majority's suggestion that *Lang* is somehow controlling would allow precedential decisional law to be created on a given issue where a losing party fails to raise that issue, simply because the facts or procedural posture of his case would theoretically have allowed him to raise it. Essentially, by failing to raise the argument and losing his case on other grounds, the *Lang* petitioner would not only waive the unlitigated claim in his own case, but would close the door on that claim on behalf of all other, similarly situated habeas petitioners. This is a legal principle with which I, at least, am unfamiliar.

[3] Other Courts of Appeals have concluded that *Teague* applies to section 2255 petitions, and have not acknowledged any difference between the analysis for habeas petitions seeking relief from federal convictions versus those seeking relief from state convictions. *See Daniels v. United States*, 254 F.3d 1180, 1194 (10th Cir. 2001); *United States v. Martinez*, 139 F.3d 412, 416 (4th Cir. 1998); *Van Daalwyk v. United States*, 21 F.3d 179, 183 (7th Cir. 1994); *Gilberti v. United States*, 917 F.2d 92, 95 (2d Cir. 1990). As Justice Brennan pointed out in his dissent in *Teague*, however, the Court's opinion had nothing to do with section 2255 petitions. 489 U.S. at 328 (Brennan, J., dissenting); *see also United States v. Payne*, 894 F. Supp. 534, 542 (D. Mass. 1995) (ruling that *Teague* does not apply in section 2255 cases.). I would not take issue with the general conclusion reached by other courts that *Teague* is **relevant** to the retroactivity inquiry in habeas petitions brought by federal prisoners; rather, as discussed below, I think that its application should be somewhat different in this context.

majority justified its rule against the retroactive application of new rules of criminal procedure on two grounds: (1) **comity** toward state court adjudications, and (2) the **finality** of criminal judgments. *Teague*, 489 U.S. at 308 ("[W]e have recognized that interests of comity and finality must also be considered in determining the proper scope of habeas review."); *Beard*, 542 U.S. at 412 ("*Teague*'s nonretroactivity principle acts as a limitation on the power of federal courts to grant "habeas corpus relief to . . . state prisoner[s]. . . . This should make clear that the *Teague* principle protects not only the reasonable judgments of state courts but also the States' interest in finality quite apart from their courts."). Only one of these justifications — the finality of criminal judgments — is relevant in habeas cases seeking relief from convictions in federal court.

*Teague*'s concern with finality on its own likely supports the general rule of applying the case's basic premise to section 2255 petitions. That is to say that as a general matter, as with state court prisoners, federal prisoners should only be able to rely on rules that were part of the legal landscape at the time their convictions became final, based on the value of repose, and the importance of having some eventual end-point in all litigation. Because concerns with comity are reduced — if not nonexistent — in the context of section 2255, however, it would seem to me that a bit more scrutiny is warranted in determining what the legal landscape actually was, and whether a given rule was "*dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301 (emphasis in original).

As discussed above, the "dictated by prior precedent" inquiry typically turns on whether reasonable jurists, in cases prior to the decision in which the "new rule" was announced, would have deemed its outcome to be ordained by then-existing precedent. *See, e.g., Beard*, 542 U.S. at 413 (grounding the inquiry in whether "the unlawfulness of [respondent's] conviction was apparent to all reasonable jurists"); *Humphress*, 398 F.3d at 860 (same). This deferential approach might make good sense in the section 2254 context. Its focus on the divergent opinions of federal and state court judges recognizes that sometimes reasonable minds can differ over the development of legal rules. In such instances, where the application of an existing rule to a somewhat nuanced situation is debatable, the state courts should not necessarily be subject to Monday-morning quarterbacking every time they are eventually proven wrong on an issue. *See, e.g., Beard*, 542 U.S. at 412 ("*Teague*'s nonretroactivity principle acts as a limitation on the power of federal courts to grant 'habeas corpus relief to . . . **state** prisoner[s].'" (quoting *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994) (emphasis added)); *id.* at 423 (Souter, J., dissenting) ("[T]he function of *Teague*'s reasonable-jurist standard is to distinguish those developments in this Court's jurisprudence that **state judges** should have anticipated from those they could not have been expected to foresee." (emphasis added)); *Butler v. McKellar*, 494 U.S. 407, 414 (1990) ("The 'new rule' principle therefore validates reasonable, good-faith interpretations of existing precedents **made by state courts** even though they are shown to be contrary to later decisions." (emphasis added)). This concern is explicitly recognized in *Teague*: "**[s]tate courts** are understandably frustrated when they faithfully apply existing constitutional law only to have a federal court discover, during a [habeas] proceeding, new constitutional commands." 489 U.S. at 310 (quoting *Engle v. Isaac*, 456 U.S. 107, 128 n.33. (1982) (emphasis added)).

These quotations clearly reveal that the standard new rule inquiry and its reference to opinions of reasonable jurists is largely based on concerns with federalism and comity, and demonstrates deference to reasonable state court interpretations of the law. Even where the "reasonable jurists" to whom we look for guidance are federal judges, their opinions can serve as a proxy for whether a similar state court decision was reasonable. So long as state courts are applying Supreme Court case law in good faith, there is diminished justification for burdening their quasi-sovereign judicial machinery with the retroactive application of new rules in cases that have become final.

In a section 2255 case, however, where comity and federalism are irrelevant, there is much less need to defer to the divergent views of federal judges who, in hindsight, did not correctly apply existing precedent to a new case. We are, after all, members of inferior courts established by the same sovereign (unlike state court judges), and if the Supreme Court says we were wrong, we should take our medicine and gladly apply the correct rule retroactively, rather than clinging to vacated misapplications of the law to prove that a Supreme Court rule is "new" (which conveniently allows us to convince ourselves that we could not have been wrong in the first place). Nor can our difference of opinion serve as a proxy for why a prior, now invalidated decision should be deferred to as a reasonable application of the Constitution, as it might in the section 2254 context.

In fact, a less deferential approach in section 2255 cases to the divergent opinions of reasonable jurists than in section 2254 cases would parallel the standard of review codified by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Specifically, section 2254(d)(1) imposes a very deferential standard of review in habeas cases challenging state court convictions, allowing reversal only where the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." This provision has no counterpart providing a standard of review in section 2255 cases, and they are generally reviewed de novo. *See Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003).[4] The different standard of review used in habeas petitions challenging state court convictions versus that used in petitions challenging federal convictions supports, at least by analogy, a similar context-based difference in the manner in which *Teague* applies to determine a rule's newness.

---

[4]*Moss* refers to the standard by which our Court of Appeals reviews a district court's disposition of a section 2255 petition, rather than how the district court reviews the prior, direct proceedings in the underlying criminal case. But the fact that the district court in which the petition is filed is usually the same court that originally handled the case, and has the opportunity to correct any errors it may have made, without showing any sort of awkward deference to its own earlier decision, indicates even less concern with deference in the first instance. *See Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001) ("A motion brought under § 2255 must allege one of three bases as a threshold standard: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid."). Further, some claims, such as those for ineffective assistance of counsel, can only be heard in the first instance in a petition for habeas relief under section 2255, *see United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997), providing additional support for the view of such a petition as part of the ongoing adjudication of a federal criminal case, rather than some separate, isolated proceeding, the conclusions of which are entitled to some sort of deference.

Another judge who has questioned *Teague*'s applicability in federal habeas cases has suggested that concerns of both comity and finality are diminished in section 2255 cases, in light of the fact that to a large extent, they are a continuation of the original federal criminal proceeding, rather than a purely separate and distinct lawsuit:

> To this Court, the difference in the nature of proceedings under sections 2254 and 2255 precludes application of *Teague* to federal prisoners, at least in the present circumstances:
>
> > In contrast to the "civil" and "collateral" section 2254 remedy for state prisoners, the section 2255 remedy for federal prisoners bears the markings of an integral part of a continuous criminal proceeding that is segmented by no event or condition decisive of finality. This characteristic of section 2255 proceedings creates the possibility, ignored by most courts and commentators that have faced the issue, that *Teague* does not apply in section 2255 proceedings . . . .
>
> The legislative history of section 2255 supports the view that 2255 actions are part of the criminal proceedings and that the conviction or sentence is not "final" until disposition of the habeas petition.

*Payne,* 894 F. Supp. at 543 (quoting James S. Liebman & Randy Hertz, Federal Habeas Corpus Practice and Procedure § 22A.6, at 272-74 (Michie Supp. 1993), and Rules Governing Section 2255 Proceedings in the United States District Courts, 1 Advisory Committee Note (1976 Adoption) (2255 motion "is a further step in the movant's criminal case and not a separate civil action")).

This is all to say that there would be good reason to conclude that in section 2255 cases, divergent past opinions of "reasonable" jurists should not be enough to demonstrate that a rule is new.[5] This approach would not undermine the central premise of *Teague*'s general rule against retroactivity. Rather than hanging onto the now-vacated opinions of reasonable jurists, I would focus primarily on the straightforward question of whether the new decision "simply applie[s] a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law." *Penry v. Lynaugh*, 492 U.S. 302, 314 (1989) (quoting *Mackey v. United States*, 401 U.S. 667, 695 (1971) (Harlan, J., concurring in part and dissenting in part)). To the extent there is a need to articulate what my "federal-*Teague*" or "*Teague*-light" standard would be, this language from *Penry* would encapsulate it precisely.

II.

This discussion brings me to the question of whether *Booker* created a new rule. In my mind, there can be little argument that *Booker* did nothing more than "simply appl[y] a well-established constitutional principle [the rule from *Apprendi*] to govern a case which is closely analogous." The well-established constitutional principle is that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. The closely analagous question presented in *Booker*, was, in the Court's own words, "whether our *Apprendi* line of cases applies to the sentencing guidelines."[6] 543 U.S. at 229.

Justice Stevens's opinion for the Court in *Booker* — the portion of the opinion that addressed the constitutionality (but not the remedy) of mandatory application of the Federal Sentencing Guidelines — made explicit that it was a straightforward application of *Apprendi* to the Sentencing Guidelines, rather than the creation of a new rule: "we **reaffirm our holding in *Apprendi***: Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at 244 (emphasis added). I am mindful of the Supreme Court's warning that "the fact that a court says that its decision is within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under *Teague*." *Butler*, 494 U.S.

---

[5] This view might seem somewhat novel among federal judges, but I would note that at least one commentator has made similar observations pertaining to "*Teague*-light" in federal habeas petitions:

> [U]nlike motions filed under the state habeas statute, which are governed by 2254, 2255 motions are filed in the federal district court that originally imposed the sentence. Consequently, the great fear in *Teague* that retroactivity would upset federal-state relations by interfering with the finality of state court judgments and unduly burdening state court systems with rehearings is simply not present with 2255 motions, As recently as 2004, the Court acknowledged that the justification for the *Teague* ban hinged on the fact that *Teague* involved state habeas petitioners. [citing *Beard*] . . . In the wake of *Blakely* and *Booker*, however, lower federal courts and commentators seem oblivious to the difference between state and federal habeas challenges and why each might fare differently under the principles of *Teague*.

Nicholas J. Eichenseer, Comment, *Reasonable Doubt in the Rear-View Mirror: The Case for Blakely-Booker Retroactivity in the Federal System*, 2005 Wis. L. Rev. 1137, 1167 (2005).

[6] The Court explained the issue somewhat more thoroughly by quoting the first question presented: "[w]hether the Sixth Amendment is violated by the imposition of an enhanced sentence under the United States Sentencing Guidelines based on the sentencing judge's determination of a fact (other than a prior conviction) that was not found by the jury or admitted by the defendant." 543 U.S. at 229 n.1.

at 415. Even so, *Booker* did not create a new rule because it did not "break new ground." *Teague*, 489 U.S. at 301. Instead of creating some new principle of law, or making an extension of the law that was "controlled" by a prior holding, it simply applied the same legal principles it had articulated in *Apprendi* and *Blakely* to a new sentencing scheme: "More important than the language used in our holding in *Apprendi* are the **principles** we sought to vindicate. Those **principles** are unquestionably applicable to the Guidelines." *Booker*, 543 U.S. at 238 (emphasis added). Revolutionary as the holding in *Booker* may have seemed, the true upheaval actually occurred in *Apprendi* through its resuscitation of the Sixth Amendment jury trial right.

Unlike today's majority and the *Humphress* Court, I am unconvinced that the dissents in *Booker* and *Blakely* were "indicative of the *Booker* rule's 'newness.'" Although I tend not to engage in the practice of counting justices, it is apparent from a review of the opinions in these cases and *Apprendi* that the dispute between justices is over the fundamental premise of *Apprendi* rather than whether or not it foreordained *Booker*'s constitutional holding. This observation is based not only on the identities of the individual dissenters, but the legal principles they relied upon in each of the three cases. *See, e.g., Apprendi*, 530 U.S. at 543-544 (O'Connor, J., dissenting) ("The actual principle underlying the Court's decision . . .would apply not only to schemes like New Jersey's, under which a factual determination exposes the defendant to a sentence beyond the prescribed statutory maximum, but also to all determinate-sentencing schemes in which the length of a defendant's sentence within the statutory range turns on specific factual determinations (e.g., the federal Sentencing Guidelines)."); *id.* at 565 (Breyer, J., dissenting) ("As Justice O'Connor points out, the majority's rule creates serious uncertainty about the constitutionality of such statutes and about the constitutionality of the confinement of those punished under them."); *Blakely*, 542 U.S. at 323, 324-25 (O'Connor, J., dissenting) ("It is no answer to say that today's opinion impacts only Washington's scheme and not others, such as, for example, the Federal Sentencing Guidelines. . . . The fact that the Federal Sentencing Guidelines are promulgated by an administrative agency nominally located in the Judicial Branch is irrelevant to the majority's reasoning. The Guidelines have the force of law, . . . and Congress has unfettered control to reject or accept any particular guideline. The structure of the Federal Guidelines likewise does not, as the Government half-heartedly suggests, provide any grounds for distinction."); *id.* at 346 (Breyer, J., dissenting) ("Taken together these three sets of considerations, concerning consequences, concerning history, concerning institutional reliance, leave me where I was in *Apprendi*, i.e., convinced that the Court is wrong."); *Booker*, 543 U.S. at 327, 330 (Breyer, J., dissenting) ("The Chief Justice, Justice O'Connor, Justice Kennedy, and I have previously explained at length why we cannot accept the Court's constitutional analysis. . . . The upshot is that the Court's Sixth Amendment decisions — *Apprendi*, *Blakely*, and today's — deprive Congress and state legislatures of authority that is constitutionally theirs."); *see also id.* at 288 (Stevens, J., dissenting in part) ("In reality, the [remedial] majority's concerns . . . are nothing more than an objection to *Apprendi* itself.").

Of course, Supreme Court justices have the luxury of being able to vote to overturn the Court's prior precedent, unlike the rest of us who must fall in line once the magic number of five votes is cast. There is no reason for us to be surprised by the *Apprendi* dissenters' continued opposition to the rule from that case, which is justified by both their viewpoints and their jobs. A candid look at the differences of opinion between the Justices in these three cases does not suggest to me, however, anything more than an ongoing dispute over the premise underlying *Apprendi*.

Therefore, I cannot read their divergent viewpoints regarding *Apprendi* to suggest that it did not command the result in *Booker*.[7]

In fact, the *Apprendi* dissenters said at the time of the decision that it would require reversal of the Guidelines, as quoted above. Further, like the *Booker* constitutional majority eventually held, the *Apprendi* dissenters made clear that any distinctions based on the structure or the source of authority (administrative versus legislative) of the federal guidelines was not a meaningful one.[8] For their part, the majority opinions in *Apprendi* and *Blakely* only stated that the federal guidelines were not in front of the Court, rendering it impossible to make any judgment with regard to the constitutionality of their application.[9] 530 U.S. at 497 n.21. Five years later, the dissenters' prediction proved correct, in a remarkably straightforward application of *Apprendi* to the Sentencing Guidelines. I therefore believe that *Booker* "simply applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law." *Penry*, 492 U.S. at 314.[10]

---

[7] There are many areas of the law where particular Supreme Court justices have continued to argue against a certain legal rule even after it is established as precedential authority. As an example, for fourteen years after the Court declared in *Gregg v. Georgia,* 428 U.S. 153, 169 (1976) that "the punishment of death does not invariably violate the Constitution," Justices Brennan and Marshall adhered to their dissenting opinions from *Gregg* that the death penalty always violates the Eighth and Fourteenth Amendments. *See, e.g., Walton v. Arizona,* 497 U.S. 639, 674-75 (1990) (Brennan, J., with whom Marshall J., joins, dissenting) ("I also adhere to my view that the death penalty is in all circumstances a cruel and unusual punishment." (citing *Gregg,* 428 U.S. at 230-31 (Brennan, J., dissenting)). In fact, a Lexis-Nexis search for "Dissentby (Brennan) and Dissentby (Marshall) and death penalty" yields 1440 cases since 1976, the vast majority of which appear to contain the oft recited phrase "[a]dhering to our views that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments . . . ." *See, e.g., Boggs v. Muncy,* 497 U.S. 1043 (1990). Well placed as their arguments may have been, it would be an uphill battle to point to this entrenched resistance by these two esteemed justices as diminishing the precedential significance of *Gregg,* or as indicating that the death sentences of subsequent litigants were somehow less controlled by the Court's prior death penalty jurisprudence.

*See also Gonzales v. Carhart,* 550 U.S. ___, Nos. 05-380 and 1382 (2007) (Thomas, J., joined by Scalia, J., concurring) ("I write separately to reiterate my view that the Court's abortion jurisprudence, including *Casey* and *Roe v. Wade,* 410 U.S. 113 (1973), has no basis in the Constitution.").

[8] It seems that the United States had accepted this reality as well after *Apprendi*, or at least by the time *Blakely* was argued in the Supreme Court. *See Blakely*, 542 U.S. at 305 n.9 ("The United States, as amicus curiae, urges us to affirm. It notes differences between Washington's sentencing regime and the Federal Sentencing Guidelines but questions whether those differences are constitutionally significant.").

[9] As the majority points out, other federal courts have pointed to the Supreme Court's "reserving judgment" on the constitutionality of the guidelines in *Apprendi* and *Blakely* in support of their determination that *Booker* created a new rule. *See, e.g., McReynolds v. United States*, 397 F.3d 479, 481 (7th Cir. 2005). In my mind, these statements about reserving judgment have nothing to do with the newness inquiry. It is a fundamental principle of the judicial process that courts can only consider one case at a time, *see Griffith v. Kentucky*, 479 U.S. 314, 323 (1987), and the Supreme Court's refusal to reach past the case presented to it has little to do with whether the opinion in one case dictates the result in a subsequent case. The Seventh Circuit's reasoning in *McReynold*'s would essentially mean that every Supreme Court decision announces a "new rule," except in the unlikely scenario where the Court grants certiorari to hear a case presenting an issue identical to one it has already decided and then decides it in an identical fashion.

[10] Although the focus of my dissent is that *Booker* should apply retroactively to convictions that became final after *Apprendi* because it did not create a new rule, a strong argument can also be made that *Booker* fits into one of the exceptions to *Teague*'s general prohibition of the retroactive application of new rules. *See* David E. Johnson, Note, *Justice for All: Analyzing Blakely Retroactivity and Ensuring Just Sentences in Pre-Blakely Sentences*, 66 Ohio St. L.J. 875, 908-22 (2005). Specifically, where a new rule is deemed a "watershed rule[] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding," it still can apply retroactively. *Beard*, 542 U.S. at 417 (quoting *O'Dell v. Netherland*, 521 U.S. 151, 157, (1997)). The command from *Apprendi*, *Blakely*, and *Booker* that facts

III.

It is easy to lose sight of, but essential to bear in mind, what the Court meant when it "reaffirmed" its holding from *Apprendi* in *Booker*, and why and to what extent, for purposes of retroactivity, *Booker* applied the holding from *Apprendi*. *Booker*'s remedial resolution to the Constitutional problems created by mandatory application of the Federal Sentencing Guidelines was delivered in a complicated opinion that continues to cause confusion for the lower federal courts two years after it was decided. Although in my view *Booker*'s constitutional holding resulted from a straightforward application of *Apprendi*, anyone who could have predicted the case's remedial holding would have been several steps ahead of the proverbial reasonable jurist, if not a bona fide fortune-teller.[11]

---

necessary to support a sentence beyond the maximum authorized by a conviction "must be admitted by the defendant or proved to a jury beyond a reasonable doubt," would clearly appear to amount to a rule implicating fundamental fairness and accuracy.

The Supreme Court has partially rejected this argument, holding that assignment of the factfinding role to a jury, rather than a judge, does not necessarily increase the accuracy of a criminal proceeding. *Schriro v. Summerlin*, 542 U.S. 348, 356 (2004) ("[F]or every argument why juries are more accurate factfinders, there is another why they are less accurate."). In holding that *Booker* was a new rule, our Circuit's *Humphress* opinion relied on *Schriro*'s conclusion that a jury does not necessarily make more accurate factual determinations than a judge. *Schriro*, however, did not analyze the separate but related requirement of *Apprendi* that facts necessary to the sentence must be found beyond a reasonable doubt. *See* Johnson, 66 Ohio St. L.J. at 915. *Humphress* did not account for the increased standard of proof required by *Apprendi*. Raising the standard of proof from the pre-*Booker* preponderance of the evidence to the *Apprendi*-mandated beyond a reasonable doubt must clearly have a profound effect on the accuracy of sentencing procedures. *Id.* at 915-22; *see also In re Winship*, 397 U.S. 358, 363 (1970) ("The reasonable-doubt standard . . . is a prime instrument for reducing the risk of convictions resting on factual error.").

[11] In a particularly thorough opinion, United States District Judge William Young of the District of Massachusetts has set forth an insightful historical account of the developments leading up to the *Booker* decision, and how he has implemented the requirements of *Apprendi*, *Blakely*, and *Booker* in his court. *United States v. Kandirakis*, 441 F. Supp. 2d 282 (D. Mass. 2006). Judge Young anticipated the Constitutional problems with the Federal Sentencing Guidelines, and ruled them unconstitutional prior to the Supreme Court's decision in *Blakely*. *Id.* (citing *United States v. Green*, 346 F. Supp. 2d 259 (D. Mass. 2004)). As a result, prior to the *Booker* decision, he implemented a sentencing scheme that he referred to as "*Blakely*-izing" the Guidelines by requiring the government to prove to the jury beyond a reasonable doubt any sentencing enhancements that it would seek, a process that as he explained "reflected the preferred remedy of the dissenting Justices in Remedial *Booker*." *Id.* at 318-19.

Although, as Judge Young notes, "[t]he consequences of *Apprendi* for the Federal Sentencing Guidelines were immediately apparent,"*id.* at 287, his opinion makes clear that these consequences primarily played out in *Booker*'s Constitutional holding. As for *Booker*'s remedial opinion, which Judge Young described learning of with the following humorous anecdote, he was left rather puzzled:

> I well remember the advent of *Booker*. We were trying a jury case. The law clerks, recognizing my continuing interest in these matters, e-mailed the decision to my courtroom deputy clerk, Elizabeth Smith, in the courtroom. She began printing out the decision. The courtroom printer is notoriously slow. As the first page came out of the printer, she slapped on a "Post-It" note and, grinning, passed it up to me. On the note was a little smiley face and the words "You'll love this!" Page by page, Justice Stevens's majority opinion was passed up to me until it was fully assembled.
> The printer kept on humming.
> Ms. Smith stopped passing the pages in order to scan for herself what turned out to be Remedial *Booker*. After three or four pages had printed out, she applied another "Post-It" and, crestfallen, passed them up. The second note read, "How can there be two different majority opinions in the same case?" How indeed?

*Id.* at 319.

The fact that the remedial holding from *Booker* was not entirely predictable, however, does not diminish the significance of the dictated-by-prior-precedent Constitutional holding. The invalidation of sentences imposed under a mandatory application of the guidelines is enough to justify retroactivity analysis on its own, aside from the predictability of the remedy that was chosen to fix the Constitutional violation. Further, while the remedy preferred by the dissenters from *Booker*'s remedial holding would appear to have had a more significant effect on the actual length of sentences, the remedial holding still carries profound implications regarding both the length of sentences and the methods by which they are imposed. The opinion's remedial holding might mathematically reduce the disparity between the duration of an unconstitutional sentence under the mandatory guidelines and that of an acceptable post-*Booker* sentence that treats the guidelines as advisory.[12] *See Booker*, 543 U.S. at 302 (Stevens, J., dissenting in part) ("[T]he Court [in Remedial Booker] has effectively eliminated the very constitutional right *Apprendi* sought to vindicate."). The positions of the petitioners in the instant case illustrates, however, how a defendant sentenced under the post-*Booker* advisory guidelines regime still stands to serve a shorter sentence, rendering the question of *Booker*'s retroactive application something more than a purely academic exercise.

Each petitioner was sentenced under the pre-*Booker* mandatory Guidelines scheme. For each, therefore, the maximum sentence authorized by the facts established by the jury verdict was set by the range required by the Sentencing Guidelines.[13] *See, e.g., United States v. Blood*, 435 F.3d 612, 630 (6th Cir. 2006); *United States v. Oliver*, 397 F.3d 369, 378 (6th Cir. 2005) ("Given that the federal sentencing guidelines were mandatory at the time the district court sentenced Oliver, it seems clear now in light of *Booker* that the sentence imposed violated the Sixth Amendment."); *United States v. Davis*, 397 F.3d 340, 351 (6th Cir. 2005). It is undisputed that the 292 month sentences that both petitioners received were predicated on the district judge finding, based on a preponderance of the evidence, that 1.5 kilograms of crack cocaine could be attributed to each. The drug amount calculation made by the judge by a preponderance of the evidence resulted in each petitioner going from one extreme of the Guidelines based on the Drug Quantity Table of section 2D1.1 to the other extreme — that is to say they each received the highest possible base offense level based on a quantity of drugs alone of 38. Jimmy Ray Valentine also received a two-point offense level enhancement based on the district judge's determination that he played an aggravated leadership role in the drug conspiracy, resulting in a total offense level of 40.

Based on the jury verdict alone, which included no finding of an amount of drugs, the highest possible base offense level was 12. *See* U.S.S.G. § 2D1.1 (c). At this level, Jimmy Ray would have

---

[12] It also does not require profound statistical analysis to understand that the presumption of reasonableness afforded a within-guidelines sentence by the Courts of Appeals, including ours, has tended to diminish any meaningful difference in sentence length between pre-*Booker* sentences under the mandatory guidelines and post-*Booker* sentences. Douglas A. Berman, *Reasoning through Reasonableness*, 115 Yale L.J. Pocket Part 142, 143 (July/Aug. 2006) ("Post-*Booker* circuit doctrines and practices encourage the sort of rote, mechanistic reliance on the Guidelines that Justice Stevens's merits opinion found constitutionally problematic."). When consulted, the statistics paint an even starker picture than an observer might have hypothesized. Essentially, the presumption of reasonableness has functioned to vitiate both holdings of *Booker* by placing non-subtle pressure on district courts to institute a within-guidelines sentence so as to avoid reversal. *See* Brief for New York Counsel of Defense Lawyers as Amicus Curiae, *Rita v. United States*, No. 06-5754 (U.S. Dec. 18, 2006) (surveying appellate decisions regarding sentencing appeals and concluding that of 1,152 within-guidelines sentences appealed by defendants, only 16 were reversed, while 60 of 71 below-guidelines sentences appealed by the government have been reversed, yet only 7 of 154 above-guidelines sentences appealed by defendants have been reversed).

[13] This analysis would be different had they been sentenced under the post-*Booker*, advisory Guidelines regime, as the statutory maximum sentence for the crime of which they were convicted, not the Guidelines range, would set the ceiling. *See United States v. Duckro*, 466 F.3d 438, 443 (6th Cir. 2006).

received a 10-16 month sentence (for his criminal history category of I), and Kenneth would have received a 15-21 month sentence (for his criminal history category of III). Instead, in stark contrast, they both received sentences of 292 months.[14] This equates to a twenty-four year, four month sentence for each — the difference of time each will spend in prison based on facts that were not found by a jury beyond a reasonable doubt is over twenty-two and a half years.

This is not to suggest that the petitioners have some claim to these specific shorter sentences, because were we to remand for resentencing under remedial *Booker*, the district court could certainly give a sentence within the same guideline range based on judge-found facts, so long as the guidelines range was applied in an advisory fashion. In Jimmy Ray's case, however, the district court would not be able to impose a sentence over 240 months at his hypothetical resentencing, as that is the statutory maximum for his offense. *See Duckro*, 466 F.3d at 443 ("[I]n cases where sentencing occurred post-*Booker*, with the sentencing guidelines applying in only an advisory fashion, the maximum sentence authorized by the facts established through a guilty plea is the 'maximum sentence prescribed by the applicable statutory provision.'"). That is to say that Jimmy Ray would stand to have more than four years reduced from his sentence under *Booker* and *Apprendi*. Although Kenneth's sentence would not be similarly limited, as his prior drug conviction raises the statutory maximum to thirty years, the district court could have also, of course, chosen to sentence below the guidelines range of 292 months — a realistic possibility in light of its selection of the very bottom of the then-mandatory guidelines range. The upshot of the complicated effect of the guidelines is that both petitioners would have much to gain from a remand for resentencing under *Booker*, as they would stand to get sentences that were both shorter and Constitutional. Not only did their sentences violate *Booker*, but they violated the principle of *Apprendi* that any fact "necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."

Of perhaps greater importance than any numerical disparities in the lengths of sentences, however, is the less concrete but more profound value of imposing criminal sentences **only after** ensuring that vital, centuries-old Constitutional guarantees have been met:

> "What is overlooked in post-*Booker* discussions is the fact that, for seventeen years, federal courts had been sentencing offenders unconstitutionally." (quoting Professor Douglas Berman, Remarks at Harvard Black Letter Law Association (Apr. 4, 2006)). For seventeen years federal courts had been sentencing offenders unconstitutionally. Think about that. The human cost is incalculable — thousands of Americans languish in prison under sentences that today are unconstitutional. The institutional costs are equally enormous — for seventeen years the American jury was disparaged and disregarded in derogation of its constitutional function; a generation of federal trial judges has lost track of certain core values of an independent judiciary because they have been brought up in a sentencing system that strips the words "burden of proof," "evidence," and "facts" of genuine meaning; and the vulnerability of our fair and impartial federal trial court system to attack from the political branches of our government has been exposed as never before in our history.

---

[14] The judge's finding that Jimmy Ray had an aggravating role in the conspiracy and the resulting two point enhancement gave him an offense level of 40 with a criminal history category of I, which amounted to the functional equivalent of Kenneth's offense level of 38 with a criminal history of III. Each calculation led to a guideline range of 292-365 months, and the district judge gave both the minimum sentence allowed.

*Kandirakis*, 441 F. Supp. 2d at 283. Stated somewhat differently, the *Apprendi* line of cases means much more than how long the government can send a defendant to jail — it speaks volumes about how we, as a democratic society, are able to follow the strictures that represent the very backbone of our legal and Constitutional system. *See, e.g., Apprendi*, 530 U.S. at 466 ("'To guard against a spirit of oppression and tyranny on the part of rulers,' and 'as the great bulwark of [our] civil and political liberties,' trial by jury has been understood to require that 'the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours . . . .'" (quoting 2 J. Story, Commentaries on the Constitution of the United States 540-541 (4th ed. 1873) and 4 W. Blackstone, Commentaries on the Laws of England 343 (1769)). *Apprendi* and its offspring — *Blakely* and *Booker* — recognize a critical, constitutionally mandated check on the sentencing process, through the grounding of sentencing determinations in facts that have been proved to the jury beyond a reasonable doubt. Our modern federal judiciary has been reluctant to recognize this Sixth Amendment limitation,[15] probably due to the primacy of the mandatory sentencing guidelines that has been ingrained in our approach to sentencing for seventeen years. Although this is an innate and natural way for anyone to think, federal judges included, our personal experience over seventeen years clearly must take a backseat to the fundamental guarantees of the centuries-old Bill of Rights, with the benefit of the Supreme Court's reinvigoration of these values through *Apprendi* and its progeny (i.e. *Booker*).

IV.

Because I do not believe *Booker* to be a new rule but rather to be a straightforward application of *Apprendi*, federal habeas petitioners whose convictions became final after *Apprendi* should be able to benefit from *Booker*. For this reason, I respectfully dissent from the majority opinion with respect to Part II. B.

---

[15] *See, e.g., Koch*, 383 F.3d at 438 ("[W]e conclude that Blakely does not require us to invalidate the Guidelines.").